IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

DEBORAH CONNOR                      §
                                    §
V.                                  §          ACTION NO. 4:10-CV-855-Y
                                    §
AUDREY DECKINGA, ET AL.             §

ORDER GRANTING MOTIONS TO DISMISS
AND MOTIONS FOR SUMMARY JUDGMENT

     Pending before the Court are Defendants' Motion to Dismiss and Alternative Motion for

Partial Summary Judgment (doc. 65) and Supplemental Motion to Dismiss and Alternative Motion

for Partial Summary Judgment (doc. 101).  The Court grants the motions.


I.  BACKGROUND

A.  FACTUAL BACKGROUND

     Plaintiff Deborah Connor's daughter, A.S. ("Mother"), is the mother of two children, T.H.

and R.R.H. ("the children"), with J.H. ("Father").  (2d Am. Compl. 4.)  In July **2006**, the Texas

Department of Family and Protective Services ("DFPS") filed a suit affecting the parent-child

relationship ("SAPCR") in which it sought to terminate Mother's and Father's parental rights.

DFPS then began an investigation of the reports of neglectful supervision and physical abuse by

Mother and Father that led to the SAPCR.  Some of these reports came from Connor who was

concerned about Father's drug use.  (Pl. Am. App. 93.)  Defendant Joyce Coleman was the director

of a DFPS investigation section that oversaw the unit supervised by defendant Paula Reitz.  (Defs.

Supp. App. 1-2.)  Reitz arranged for the children to be placed with their father's mother,

Grandmother B.H.  Then Reitz assigned Dané Niki Smith to investigate the children's family

situation.  Connor contacted Smith and stated she wanted the children to be placed in her custody

in Utah even though she had "not seen them."  (Defs. Supp. App. 212.)  Connor admitted that she previously had lost custody of her own children, including A.S., but claimed it was based on false accusations.  (Defs. Supp. App. 12, 212.)

Grandmother B.H. asked that the children be removed from her care shortly after their placement with her.  (Defs. Supp. App. 14.)  The children were then placed with Father under the terms of a safety plan.  (Defs. Supp. App. 2.)  When Father did not follow the plan, Smith removed the children from Father's home, and Coleman approved.  (Defs. Supp. App. 2, 8, 21.)  The SAPCR court gave DFPS temporary managing conservatorship of the children after an August 3 ex-parte hearing.  (Defs. Supp. App. 2, 8.)

On August 30, the SAPCR court held a show-cause hearing regarding the removal of the children.  Connor and Reitz appeared.  (Defs. Supp. App. 2, 10.)  Mother testified that she did not have any family that the children could be placed with.  (Defs. Supp. App. 10.)  Allegedly out of fear, Connor did not tell the SAPCR court at the hearing that she wanted custody of the children. (Defs. Supp. App. 231.) Reitz did not proffer Connor as "an appropriate kinship placement" because Connor lived in Utah, Mother previously had been removed from Connor's custody, and a required placement assessment had not been conducted under the Interstate Compact for the Placement of Children ("ICPC").  (Defs. Supp. App. 2.)  The SAPCR court affirmed the placement of the children with DFPS as the temporary managing conservator.  (Defs. Supp. App. 241.)  The case was transferred from Coleman and Reitz's department to the conservatorship unit, ending their involvement in the case.  *See* Tex. Human Res. Code Ann. § 40.0525 (West 2001).  (Defs. Supp. App. 2, 22.)  The day after the show-cause hearing, Connor and Mother visited with the children, where "naturally [the children] did not interact at first."  (Def. Supp. App. 10-11.)

2

After the transfer to the conservatorship unit, Scott Flanigan was assigned as the substitute case worker for the children. He prepared a family-service plan on August 31 with a goal of family reunification. (Defs. Supp. App. 245.) Connor contacted Flanigan and requested that a home study be completed under the ICPC so the children could be placed with her in Utah. (Defs. Supp. App. 259.) Flanigan complied and requested the study be completed by Utah. The case then was reassigned to defendant Jeannette Leong. (Defs. Supp. App. 23.) Although Leong began to doubt Connor's fitness as a placement option for the children, she told Utah to continue the ICPC study because Mother had by then joined Connor's request for the placement. (Defs. Supp. App. 77.) In April **2007**, DFPS contacted Connor and informed her that the ICPC study "is expected to be completed by the end of May 2007." (Defs. Reply App. 354.) Also during that April, Connor contacted DFPS and expressed her concern that DFPS was over-medicating the children with psychotropic drugs. (Pl. Am. Resp. 71, 101-06.) DFPS re-examined the children's medications, which were eventually discontinued. (Pl. Am. Resp. 71, 106.)

On July 9, Connor filed an objection in the SAPCR court challenging any possible placement of the children with Father or Grandmother B.H. (Defs. Supp. App. 227-28.) Connor also asked the SAPCR court to continue the case until her ICPC study could be completed. The SAPCR court continued the termination hearing until November 5. (Defs. Supp. App. 69.) On July 10, Father tested positive for illegal drugs, which violated the family-service plan; thus, Leong changed the family-service plan from family reunification to termination of parental rights with alternate family placement, relative placement, or adoption. (Defs. Supp. App. 24, 43, 68.) Leong specified that a "secondary plan may be placement with [Connor] in Utah pending a favorable [ICPC] Home Study." (Defs. Supp. App. 266.) Connor continued to contact Leong repeatedly raising her past custody

3

issues with her own children and her allegations of conspiracies and corruption within multiple child-services agencies.  (Defs. Supp. App. 69-71, 272-79, 280, 282.)  Leong began to suspect that Connor was emotionally unstable, but continued to seek completion of the Utah ICPC study.  (Defs. Supp. App. 25, 281.)

Connor also repeatedly contacted Gina Timmerman, who was responsible for Connor's ICPC study in Utah.  (Defs. Supp. App. 280.)  Timmerman also began to suspect Connor was mentally unstable based on these contacts.  (Defs. Supp. App. 280.)  Leong's supervisor suggested that Connor undergo a psychological evaluation as part of the ICPC study.  (Defs. Supp. App. 153.)  On August 27, Mother told Leong that her own mother, Connor, was "nuts" and should not be considered for placement.[1]  (Defs. Supp. App. 24, 59.)  That same day, Leong informed Connor that she needed to complete a psychological evaluation to be considered for placement.  (Defs. Supp. App. 57, 285.)  On September 7, Connor sent Leong a 2005 psychological evaluation that appeared to have been conducted when Connor was attempting to gain visitation with her then 15-year-old son.  (Defs. Supp. App. 296-99.)  The evaluation noted that Connor had anxiety disorder, had obsessive-compulsive personality disorder, and had "moderate difficulty in social, family, and occupational functioning."  (Def. Supp. App. 299.)

Leong continued to explore Connor as a possible placement option, however, and to update Connor on the status of the ICPC study.  (Defs. Supp. App. 25; Defs. Reply App. 371, 373-74.)  In October, Leong contacted eight references Connor had provided.  (Defs. Supp. App. 25, 300-02.)  On October 16, Leong contacted Connor and told her that the termination hearing was scheduled for November 5.  Leong reminded Connor that she needed to submit an updated psychological

---

[1]Mother later told Leong that Connor had threatened to kill a judge in connection with Connor's child-custody case in Utah.  (Def. Supp. App. 50.)

evaluation. (Defs. Supp. App. 39.)  On October 20, Connor left eleven voice messages for Leong, some of which included threats and name calling. (Defs. Supp. App. 41.)  Four days later, Connor called Leong and told her that she would not have a new psychological evaluation done because she could not pay for it and that she had post-traumatic stress disorder. (Defs. Supp. App. 41, 284.) That same day, Leong contacted Utah and directed that the ICPC study should be completed without an updated psychological evaluation of Connor. (Defs. Supp. App. 42.)  The ICPC study identified Connor as a possible "placement resource." (Pl. Am. App. 29.)  Leong ultimately concluded that the children should not be placed with Connor:

> Given the results of the two-year-old psychological report, [Mother's] concerns about placement of her children with her mother, the erratic, lengthy and repeated calls from Connor as well as her own admission that her own children had been removed from her custody, I was not convinced that placement of the children with Connor would be in their best interests.

(Defs. Supp. App. 25.)  Leong's supervisor, Lucille Armstrong, made the ultimate decision not to recommend placement with Connor "based on our contact with her throughout the years the case has been in our system, and what we observe to be emotional instability." (Pl. Am. App. 108; Defs. Supp. App. 281.)  Connor was not told she would not be recommended for placement. (Pl. Am. App. 3.)

On November 1, Connor sought to dismiss the children's guardian ad litem, intervene in the case, and transfer the case to Utah. (Defs. Supp. App. 219-26.)  The termination hearing began on November 5. (Defs. Supp. App. 199.)  Connor attended and was represented by counsel. (Defs. Supp. App. 314, 316.)  The SAPCR court had appointed special advocates for the case who recommended that Mother's and Father's parental rights be terminated. (Defs. Supp. App. 325.) As part of her report, the special advocate noted that Connor was volatile and had previously lost

custody of her own children, that Mother did not want Connor to have custody of the children, and that Connor had verbally harassed the advocate.  (Defs. Supp. App. 324.)

On November 7, Connor, Father, Mother, and Grandmother B.H. visited the children at the DFPS office.  On November 21, the SAPCR court terminated Mother's and Father's parental rights. (Defs. Supp. App. 35, 202.)  There is no indication in the record that the SAPCR court addressed Connor's November 1 motions.  After the termination, DFPS transferred the case to the adoption unit, which ended Leong's involvement.  (Defs. Supp. App. 25, 166.)  Father appealed, but the state court of appeals affirmed the termination.  *See In re T.H.*, No. 2-07-464-CV, 2008 WL 4831374, at *9 (Tex. App.—Fort Worth Nov. 6, 2008, no pet.) (mem. op.).  On March 27, **2009**, the SAPCR court granted a petition for the adoption of the children.  (Defs. Supp. App. 207.)  Connor moved to Texas from Utah in February 2011 after Mother had another child.  (2d Am. Compl. 9.)

## B.  PROCEDURAL BACKGROUND

On November 8, **2010**, Connor filed the instant suit against Coleman, Reitz, Leong, Joyce James,[2] and Audrey Deckinga[3] (collectively, "Defendants").  Against Deckinga, Connor argued that (1) the statutes regarding standing to bring a SAPCR suit—sections 102.001 through 102.013 of the Texas Family Code—are unconstitutional as applied and (2) the statutes regarding possession of or access to a grandchild—sections 153.433 and 153.434 of the Texas Family Code—are unconstitutional on their face and as applied.  Against all defendants, Connor raised claims for violations of her rights to procedural and substantive due process.  Connor also raised a claim as next friend of the children that their rights to substantive due process had been violated by

---

[2]James was the deputy commissioner for the child-services division of DFPS until September 2010, after the adoption of the children.

[3]Deckinga is the current deputy commissioner for the child-services division of DFPS.

Defendants.[4]  Connor brought her claims against Defendants in their personal capacities.[5]  (2nd Am. Compl. 5-6.)

On April 20, **2011**, the Court dismissed Connor's next-friend claim for lack of jurisdiction and dismissed the remainder of her claims as time-barred.  Connor sought reconsideration of the dismissal and asked for leave to amend her complaint to cure the limitations bar.  The Court vacated the dismissal and granted Connor leave to amend her complaint, which Connor did.  Defendants again moved to dismiss Connor's claims.  On October 6, 2011, the Court again dismissed Connor's next-friend claim for lack of jurisdiction, but refused to dismiss Connor's remaining claims on limitations grounds based on her plausible tolling allegations.

Defendants answered Connor's allegations and raised the defense of qualified immunity; therefore, the Court entered an scheduling order for the consideration of the qualified-immunity defense.  *See generally Schultea v. Wood*, 47 F.3d 1427 (5th Cir. 1995).  Defendants then filed a motion to dismiss and alternative motion for summary judgment, followed later by a supplemental motion to dismiss and alternative motion for summary judgment.  In their motions to dismiss, Defendants seek dismissal of Connor's claims that the applicable Texas statutes are unconstitutional.  *See* Fed. R. Civ. P. 12(c).  In their alternative motions for summary judgment, Defendants assert that because Connor's constitutional interest was not clearly established and because Connor cannot therefore demonstrate that Defendants' actions were objectively unreasonable, they are entitled to

---

[4]Connor's claims are identified from her July 28, 2011 second amended complaint.

[5]Connor additionally sued Deckinga in her official capacity, but solely for injunctive relief.  The Court denied Connor's request for a preliminary injunction.

qualified immunity as a matter of law.[6]  *See* Fed. R. Civ. P. 56(a); *Gomez v. Toledo*, 446 U.S. 635, 640 (1980) (stating qualified immunity usually irrelevant to existence of cause of action because it is defense available to defendant official); *Castillo v. City of Weslaco*, 369 F.3d 504, 506-07 (5th Cir. 2004) (recognizing differences between Rule 12(c) and Rule 56).

## II.  STANDARDS OF REVIEW

### A.  RULE 12(C)

In deciding a Rule 12(c) motion, the Court only may consider allegations in the pleadings and incorporated exhibits, including a Rule 7 reply and the defendant's answer.  *See* Fed. R. Civ. P. 7(a), 10(c); *Hoffman v. L&M Arts*, No. 3:10-CV-953-D, 2011 WL 3567419, at *9 (N.D. Tex. Aug. 15, 2011) (Fitzwater, C.J.) (considering attachment to answer in deciding Rule 12(c) motion); *Forgan v. Howard Cnty.*, No. 1:04-CV-233-C, 2005 WL 233808, at *6 (N.D. Tex. Feb. 1, 2005) (Cummings, Dist. J.) (considering Rule 7 reply and attached exhibits in determining Rule 12(c) motion on the basis of qualified immunity).  Documents of public record can be considered in ruling on a motion to dismiss.  *Davis v. Bayless*, 70 F.3d 367, 372 n.3 (5th Cir. 1995).

The standard for dismissal on the pleadings under Rule 12(c) is the same as that for dismissal for failure to state a claim under Rule 12(b)(6).  *See Ackerson v. Bean Dredging, LLC*, 589 F.3d 196, 209 (5th Cir. 2009).   Federal Rule of Civil Procedure 12(b)(6) authorizes the dismissal of a complaint that fails "to state a claim upon which relief can be granted."  This rule must, however, be interpreted in conjunction with Rule 8(a), which sets forth the requirements for pleading a claim for relief in federal court.  Rule 8(a) calls for "a short and plain statement of the claim showing that

---

[6]Defendants mainly raise their qualified-immunity defense under the rubric of summary judgment. The Court, likewise, will address qualified immunity under the summary-judgment standard of review.

the pleader is entitled to relief." Fed. R. Civ. P. 8(a); *see also Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 508 (2002) (holding Rule 8(a)'s simplified pleading standard applies to most civil actions). As a result, "[a] motion to dismiss for failure to state a claim is viewed with disfavor and is rarely granted." *Kaiser Aluminum & Chem. Sales v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1050 (5th Cir. 1982). The Court must accept as true all well pleaded, non-conclusory allegations in the complaint and liberally construe the complaint in favor of the plaintiff. *See id.* The plaintiff must, however, plead specific facts, not mere conclusory allegations, to avoid dismissal. *See Guidry v. Bank of LaPlace*, 954 F.2d 278, 281 (5th Cir. 1992). Indeed, the plaintiff must plead "enough facts to state a claim to relief that is plausible on its face," and his "factual allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547, 556 (2007). In short, a plaintiff must "nudge[] his claims across the line from conceivable to plausible." *Id.* at 570. This requires a plaintiff to establish more than a "sheer possibility" a defendant has acted unlawfully. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### B. RULE 56 AND QUALIFIED IMMUNITY[7]

When the record establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," summary judgment is appropriate. Fed. R. Civ. P. 56(a). "[A dispute] is 'genuine' if it is real and substantial, as opposed to merely formal, pretended, or a sham." *Bazan v. Hidalgo Cnty.*, 246 F.3d 481, 489 (5th Cir. 2001) (citation omitted). A fact is "material" if it "might affect the outcome of the suit under governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

---

[7]Defendants do not seek summary judgment on Connor's claims that certain state statutes are unconstitutional. (Supp. Mot. 1 n.1.)

9

To demonstrate that a particular fact cannot be genuinely in dispute, a defendant movant must (a) cite to particular parts of materials in the record (e.g., affidavits, depositions, etc.), or (b) show either that (1) the plaintiff cannot produce admissible evidence to support that particular fact, or (2) if the plaintiff has cited any materials in response, show that those materials do not establish the presence of a genuine dispute as to that fact. Fed. R. Civ. P. 56(c)(1). Although the Court is **required** to consider only the cited materials, it **may** consider other materials in the record. *See* Fed. R. Civ. P. 56(c)(3). Nevertheless, Rule 56 "does not impose on the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915-16 & n.7 (5th Cir. 1992). Instead, parties should "identify specific evidence in the record, and . . . articulate the 'precise manner' in which that evidence support[s] their claim." *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994).

In evaluating whether summary judgment is appropriate, the Court "views the evidence in the light most favorable to the nonmovant, drawing all reasonable inferences in the nonmovant's favor." *Sanders-Burns v. City of Plano*, 594 F.3d 366, 380 (5th Cir. 2010) (citation & internal quotation marks omitted). "After the non-movant has been given the opportunity to raise a genuine factual [dispute], if no reasonable juror could find for the non-movant, summary judgment will be granted." *Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 424 (5th Cir. 2000) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

Connor seeks relief in this case under § 1983, which "creates a private right of action for redressing the violation of federal law by those acting under color of state law." *Colson v. Grohman*, 174 F.3d 498, 504 n.2 (5th Cir. 1999) (citing *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 82 (1984)). "Rather than creating substantive rights, § 1983 simply provides a remedy

for the rights that it designates.   Thus, an underlying constitutional or statutory violation is a predicate to liability under § 1983." *Johnston v. Harris Cnty. Flood Control Dist.*, 869 F.2d 1565, 1573 (5th Cir. 1989).

But to the extent a plaintiff seeks a personal money judgment under § 1983 against a government official for actions taken under color of state law, that official may invoke his right to qualified immunity.  *See Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *Hafer v. Melo*, 502 U.S. 21, 26 (1991); *Roe v. Tex. Dep't of Protective & Regulatory Servs.*, 299 F.3d 395, 400 (5th Cir. 2002).   This immunity is afforded government official performing discretionary functions.[8] However, it is not absolute; it is qualified.  That is, they enjoy it as long as their "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson*, 555 U.S. at 231 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

Defendants seek summary judgment on the basis that they are entitled to qualified immunity from Connor's claim of a constitutional violation.  This claim of immunity is an affirmative defense that balances the important interests of holding "public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson*, 555 U.S. at 231.  Because an official is entitled to immunity from suit, not merely from liability, immunity questions should be resolved at the earliest possible stage in the litigation.  *See Hunter v. Bryant*, 502 U.S. 224, 227 (1991).

The Supreme Court has mandated a two-step inquiry for resolving government officials' qualified-immunity defense: (1) whether the facts that the plaintiff has **alleged** (at the motion-to-dismiss stage) or **shown** (at the summary-judgment stage) a violation of a constitutional or statutory

---

[8]No party convincingly argues that Defendants' challenged actions were nondiscretionary.

right; and (2) whether the right at issue was "clearly established" at the time of the defendant's alleged misconduct. *See Pearson*, 555 U.S. at 232. The right the official is alleged to have violated must be "clearly established" in a particularized sense to the context of the case. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* This Court has discretion to arrange the order of its consideration of the two prongs based upon the circumstances of the case. *See Pearson*, 555 U.S. at 236; *Lytle v. Bexar Cnty., Tex.*, 560 F.3d 404, 409 (5th Cir. 2009).

A qualified-immunity defense alters the usual summary-judgment burden of proof. *See Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010). When a defendant has asserted that defense in a summary-judgment motion, the burden then shifts to the plaintiff to demonstrate the inapplicability of the defense. *See McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002) (en banc per curiam). But being the non-moving party, all inferences are drawn in the plaintiff's favor. *See Brown*, 623 F.3d at 253. Nevertheless. conclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation will not suffice. *See Brown*, 623 F.3d at 253; *Edwards v. Loggins*, 476 F. App'x 325, 328 (5th Cir. 2012) (per curiam).

## III.  DISCUSSION

### A.  SUMMARY JUDGMENT AS TO DUE PROCESS CLAIMS

#### 1.  First Step

Defendants argue that they are entitled to judgment as a matter of law on Connor's due-process claims because she cannot show that she had a clearly established constitutionally protected interest in the possession of her grandchildren.  The Court first determines whether Connor has actually shown a violation of a constitutional or statutory right.

Connor alleges she was denied substantive and procedural due process in the termination proceedings.  As argued by Defendants, the undisputed summary-judgment evidence shows that Connor was afforded all the procedural process she was due.  (Defs. Supp. Mot. 25-27.)  Plaintiff had notice of the termination proceedings.  Indeed, she attended many of the hearings, filed numerous pleadings, and was represented by counsel at the termination hearing.  (Defs. Supp. App. 313-21.)  Also, Connor has failed to show a substantive due process violation.  Substantive due process is violated if the challenged action "can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense."  *Collins v. Harker Heights*, 503 U.S. 115, 128 (1992).  Even viewing the facts in a light favorable to Connor, there is no summary judgment evidence meeting this standard.  Therefore, Connor has failed to actually show a violation of her rights to due process.

#### 2.  Second Step

Even if Connor has actually shown a violation of her constitutional rights, she has not shown that the Defendants' actions affecting that right were objectively unreasonable in light of clearly established law.  That is, no reasonable officer in Defendants' position would have understood that what he was doing was a violation of the law.  To state a due-process claim sufficient to counter

Defendants' claim of qualified immunity, Connor must show that she was "denied a cognizable liberty or property interest clearly established either by state law or the United States Constitution." *Wooley v. City of Baron Rouge*, 211 F.3d 913, 919 (5th Cir. 2000). A right is clearly established if there is Supreme Court or Fifth Circuit case law on the point or if there is a "robust 'consensus of cases of persuasive authority.'" *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2084 (2011) (quoting *Wilson v. Layne*, 526 U.S. 603, 617 (1999)). Existing precedent does not need to be factually identical, but it must place the constitutional question "beyond debate." *Id.* at 2083.

The constitutional character of a grandparent's relationship with her grandchildren is far from established. Several federal and state courts have held that a non-custodial grandparent does not possess either a substantive due-process right to family integrity and association or a liberty interest in visitation. *See Miller v. California*, 355 F.3d 1172, 1176-77 (9th Cir. 2004) (holding grandparents had no substantive due-process right regarding grandchildren); *Brown v. Ives*, 129 F.3d 209, 211 (1st Cir. 1997) (holding grandfather's due-process right to family integrity not clearly established); *Mullins v. Oregon*, 57 F.3d 789, 794 (9th Cir. 1995) (holding grandparents had no substantive due-process right to grandchildren); *Rees v. Office of Children & Youth*, 744 F. Supp. 2d 434, 452 (W.D. Pa. 2010) (holding grandmother did not have a substantive due-process right to grandchildren), *aff'd*, 473 F. App'x 139 (3d Cir. 2012); *Clayton v. Children's Choice*, No. 09-5727, 2010 WL 3282979, at *5 (E.D. Penn. Aug. 18, 2010) (recognizing grandparents "have no protected liberty interest in the care, custody and management of their grandchildren"); *Gordon v. Lowell*, 95 F. Supp. 2d 264, 269-70 (E.D. Pa. 2000) (same); *Cooper v. Okaloosa Cnty.*, No. 3:07-CV-059, 2007 WL 3306669, at *10 (N.D. Fla. Nov. 5, 2007) (holding grandparent had no injury in fact to confer standing regarding custody of grandchildren because "grandparents do not have a fundamental right

14

to custody of or visitation with their grandchildren."); *Hede v. Gilstrap*, 107 P.3d 158, 172-74 (Wyo. 2005) (holding non-custodial grandparents did not have a constitutionally protected liberty interest in grandchildren); *In re Tompkins*, 20 S.W.3d 385, 387 (Ark. 2000) (holding grandparents had no due-process rights as to grandchildren); *Ward v. Ward*, 537 A.2d 1063, 1069 (Del. Fam. Ct. 1987); *In re I.M.S.*, No. 14-07-638-CV, 2008 WL 5059179, at *3-4 (Tex. App.—Houston [14[th] Dist.] no pet.) (holding grandmother had no common-law right to visitation with grandchildren, which precluded open-courts violation claim under Texas Constitution) (mem. op.).  On the other hand, some courts, at least in situations where the grandparent had a substantial relationship with the grandchildren, have concluded that grandparents enjoy constitutional rights regarding their grandchildren.  *See Johnson v. City of Cincinnati*, 310 F.3d 484, 501 (6th Cir. 2002) (holding grandmother with strong relationship with grandchildren had substantive due-process rights in participation in education and rearing of grandchildren); *Suasnavas v. Stover*, 196 F. App'x 647, 656-57 (10th Cir. 2006) (holding grandparents' constitutional rights of association with grandchildren clearly established).

As Defendants point out, Connor "does not allege that she had a direct role in rearing her grandchildren, must less that she ever established a 'common home' or had a custodial relationship with her grandchildren."  (Reply 4.)  In her complaint, Connor stresses her repeated attempts to be considered as a placement option for the children in arguing her due-process rights were violated by Defendants' actions.  (2d Am. Compl. 7-9; Rule 7 Reply 3-9.)  As is evident from the above recitation of cases, a grandparent's rights to due-process in seeking to obtain custody of her grandchildren is not clearly established.  Indeed, there is no "robust consensus" placing this right beyond debate.  *al-Kidd*, 131 S. Ct. at 2083-84.  The authority Connor relies on to show that her due-

process rights were clearly established—a 2005 law-review article—recognizes its tenuous status:

> The Due Process Clause . . . provides a **promising basis** for assertion of greater rights for grandparents in the custody context. Although there is no fundamental 'right to adopt,' grandparents, much like parents, **may** have a fundamental liberty interest in familial integrity and the companionship of their grandchildren.
>
> . . . .
>
> . . . Several courts have balked at the idea that grandparent-grandchild relationships should enjoy any constitutional protection in custody proceedings.

Michelle Ognibene, Comment, *A Constitutional Analysis of Grandparents' Custody Rights*, 72 U. Chi. L. Rev. 1473, 1477, 1483 (2005) (emphases added & footnotes omitted). Further, in those cases where a grandparent has been found to have a constitutional right regarding her grandchildren, the courts have referred to the close relationship the grandparent had with the grandchildren—an allegation absent from Connor's pleadings. Connor has failed to carry her burden to demonstrate the inapplicability of Defendants' qualified-immunity defense because her constitutional right to the custody of her grandchildren was not clearly established.[9]

B. DISMISSAL OF CONNOR'S CHALLENGE TO CONSTITUTIONALITY OF TEXAS STATUTES

Defendants argue that judgment on the pleadings, but not summary judgment, is appropriate regarding Connor's challenges to the constitutionality of the applicable state statutes. (Supp. Mot. 1 n.1.) The Court notes that no party specifically argues that Connor's constitutional attacks on the state statutes must be addressed if her claims do not survive Defendants' assertion of qualified immunity. Indeed, these claims are given short shrift in Defendants' motions and are ignored by Connor. The Court understands Defendants' paucity of argument because it seems a statute cannot

[9]Even if Connor's right to possession of her grandchildren were clearly established, the Court agrees with Defendants that there is no summary-judgment evidence tending to show that Defendants' actions were objectively unreasonable in the light of clearly established law. (Mot. 14-19; Supp. Mot. 27-34; Reply 10-12.)

be deemed to unconstitutionally interfere with a right that is not clearly established.  *Cf. Doe v. Heck*, 327 F.3d 492, 526-28 (7th Cir. 2003); *Greenberg v. Woodward*, No. 01-CV-10166-G, 2001 WL 1688902, at *4 (D. Mass. Dec. 12, 2001).  Here, the Court has found that Connor's right to the custody of her grandchildren is not clearly established, which would seem to foreclose an argument that the applicable statutes are unconstitutional.  In an abundance of caution, however, the Court will address (albeit in a cursory manner) Connor's constitutional claims.

Connor first argues that the standing statutes are unconstitutional as applied "insofar as [they] permit[] the state to deny a grandmother who is neither alleged nor proven to be unfit the right to parent her grandchildren when the parental rights of the child's parents have been terminated." (2d Am. Compl. 11.)  To sustain an as-applied challenge to a statute, Connor must show that the statute is unconstitutional when specifically applied to her.  *See Tex. Workers' Comp. Comm'n v. Garcia*, 893 S.W.2d 504, 518 n.16 (Tex. 1995); *In re N.C.M.*, 271 S.W.3d 327, 328-29 (Tex. App.—San Antonio 2008, no pet.).  Texas has granted grandparents standing to seek custody of their grandchildren, but such suits are governed by the best-interest-of-the-child standard applicable to other suits affecting the parent-child relationship.  *See* Tex. Fam. Code Ann. § 102.004 (West 2008).  State courts are given great discretion in making determinations of the best interests of a minor child.  *See In re M.T.C.*, 299 S.W.3d 474, 481-82 (Tex. App.—Texarkana 2009, no pet.).

The gravamen of Connor's complaint seems to be that she was not afforded the process she was due based on the standing conferred upon her by the Texas statutes.  The public court records and the facts as alleged by Connor in her amended complaint show that Connor was present at the show-cause hearing and that the SAPCR court continued the termination hearing, which allowed Connor time to complete her psychological exam for the ICPC report.  (Defs. Supp. App. 2, 10, 69;

17

Rule 7 Reply 4-9.)  Connor also was present at the termination hearing and was represented by counsel.  (Defs. Supp. App. 314, 316; Rule 7 Reply 4-9.)  Further, the SAPCR court was told of the child advocate's belief that Connor was not a suitable placement option and the reasons for that belief.  (Defs. Supp. App. 324.)  The fact that DFPS (and, impliedly, the SAPCR court) determined that she was not a viable placement option does not equate to a denial of due process or that the standing statutes were unconstitutional as applied to her.  *Cf. In re A.M.*, 312 S.W.3d 76, 87 (Tex. App.—San Antonio 2010, pet. denied) (holding 90-day deadline in section 102.006 constitutional as applied and explaining factors used to determine what process is due); *In re I.M.S.*, 2008 WL 5059179, at *3-5 (holding standing statutes were not unconstitutional under open-courts provision of Texas Constitution).

Additionally, Connor contends that sections 153.433 and 153.434 (1) are facially unconstitutional because they unreasonably interfere with a grandparent's right "to maintain a familial relationship absent any compelling interest of the State" and (2) are unconstitutional as applied because it treats her differently "than a grandparent who is the parent of a child whose parental rights were not terminated by failing to afford her an opportunity to petition the court for guardianship in the absence of any compelling countervailing State interest."  (2d Am. Compl. 12.) Indeed, these two statutes do not allow grandparents to seek possession of or access to a grandchild if the biological parents' rights have been terminated.  *See* Tex. Fam. Code Ann. § 153.433(a)(1) (West Supp. 2012), § 153.434(1)(B) (West 2008).  A facial attack on the constitutionality of a statute, unlike an as-applied attack discussed above, requires Connor to establish that the statute is constitutionally infirm in every circumstance.  *See United States v. Stevens*, 130 S. Ct. 1577, 1587 (2010); *City of Corpus Christi v. Pub. Util. Comm'n*, 51 S.W.3d 231, 240-41 (Tex. 2001).

18

As many Texas courts have held, these sections are not facially unconstitutional.  *See, e.g., In re B.R.S.*, 166 S.W.3d 373, 374 (Tex. App.—Waco 2005, no pet.) (collecting cases); *Spencer v. Vaughn*, No. 03-05-077-CV, 2008 WL 615443, at *9 n.7 (Tex. App.—Austin 2008, pet. denied) (mem. op. dicta).  Likewise, they are not unconstitutional as applied to Connor.  *See, e.g., In re C.P.J.*, 129 S.W.3d 573, 576-79 (Tex. App.—Dallas 2003, pet. denied) (collecting cases); *cf. In re A.M.*, 312 S.W.3d at 85-87 (finding section 102.006 facially constitutional and constitutional as applied and delineating factors to determine what process is required).

## IV.  CONCLUSION

Connor has shown neither an actual violation of her due-process rights nor that her constitutional right to the custody of her grandchildren was clearly established.  Therefore, Defendants are entitled to rely on the defense of qualified immunity.  Further, Connor's claims that the applicable state statutes are unconstitutional are subject to dismissal.

SIGNED March 14, 2013.

_Terry R. Means_
TERRY R. MEANS
UNITED STATES DISTRICT JUDGE

TRM/ah                                   19